FILED
DES MOINES, IOWA
02 NOV 12 PM 2:53
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IA

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| **NORTHERN NATURAL GAS COMPANY and NORTHERN BORDER PIPELINE COMPANY,** | ) | **CIVIL ACTION** |
| | ) | **NO. 4:01-CV-70473** |
| **Plaintiffs,** | ) | |
| **vs.** | ) | |
| **DIANE MUNNS, MARK O. LAMBERT, and ELLIOTT SMITH,[1] Individually in their Official Capacity as Members of the Iowa Utilities Board,** | ) | **PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR COMPLETE SUMMARY JUDGMENT** |
| **Defendants.** | ) | |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . 1

LEGISLATIVE HISTORY BACKGROUND . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 6

[1] Plaintiffs are filing, contemporaneous with their Motion for Summary Judgment and related papers, a Motion for Leave to Amend and a Second Amended Petition reflecting changes in the composition of the Board. Specifically, Allan Thoms left the Board and was replaced by Elliott Smith; Diane Munns has been named Chair.



I. IOWA'S ATTEMPT TO REGULATE THE CONSTRUCTION, OPERATION AND MAINTENANCE OF INTERSTATE NATURAL GAS PIPELINES IS PREEMPTED BY COMPREHENSIVE FEDERAL REGULATION OF THE TRANSPORTATION OF GAS IN INTERSTATE COMMERCE AND REGULATION OF RELATED FACILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. The Natural Gas Act Expressly Preempts State Regulations of Interstate Transportation of Gas and Interstate Gas Pipeline Facilities . . . . . . . . . . 6

B. The National Gas Act and Other Federal Laws and Regulations Implementing Those Laws Supersede State Regulation of Interstate Natural Gas Pipeline Construction, Operation and Maintenance by Implied Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. The Extensive Complex of Federal Statutes, Regulations, and FERC Agreements Completely Occupies the Field of Interstate Pipeline Construction, Operation and Maintenance . . . . . . . . . . . 9

2. Iowa Code Chapter 479A and the Rules Implementing the Chapter Are Preempted as They Conflict With the Federal Regulations and Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. BY IMPLEMENTING AND ENFORCING IOWA CODE CHAPTER 479A AND BY AMENDING AND ENFORCING 199 IAC CHAPTER 9 TO PROVIDE MORE BURDENSOME REGULATION OF INTERSTATE NATURAL GAS PIPELINES, DEFENDANTS HAVE IMPAIRED PLAINTIFFS' PRE-EXISTING EASEMENT CONTRACTS IN VIOLATION OF THE CONTRACTS CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. RELIEF AND REMEDIES UNDER 42 U.S.C. § 1983 ARE APPROPRIATE IN THE PRESENT CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## INTRODUCTION

Plaintiffs Northern Natural Gas Company ("Northern Natural") and Northern Border Pipeline Company ("Northern Border") are interstate natural gas pipeline companies with extensive transmission routes in Iowa. As described in the following background sections, Northern Natural and Northern Border are interstate pipeline companies who have been and will continue to be burdened unlawfully by Iowa's regulations. Accordingly, Northern Natural and Northern Border respectfully request the Court to grant summary judgment in their favor finding Iowa's continued attempt to regulate interstate pipelines preempted by federal law, and further finding that Iowa's regulation also violates the Contracts Clause of the United States Constitution.

## LEGISLATIVE HISTORY BACKGROUND

For more than 20 years, Iowa has engaged in an ongoing effort to comprehensively regulate the construction, operation, and maintenance standards for interstate natural gas pipelines. In 1979, the basic framework of the current regime of standards and inspections was passed by the General Assembly in Iowa Code chapter 479. In 1987, the Eighth Circuit Court of Appeals invalidated most of chapter 479 as applied to interstate natural gas pipelines, finding that federal regulation of such pipelines preempted the states attempt to impose dual regulation. ANR Pipeline Company v. Iowa State Commerce Comm'n, 828 F.2d 465 (8th Cir. 1987). In 1988, the Iowa Legislature tried again, placing those portions of chapter 479 pertaining to interstate pipelines it believed were not preempted into a new chapter -- 479A. In 1993, the Eighth Circuit again invalidated portions of the Iowa pipeline regulation, this time pertaining to hazardous liquids which are federally regulated in a manner similar to interstate pipelines for natural gas. Kinley Corp. v. Iowa Utils. Bd., 999 F.2d 354 (8th Cir. 1993).

Again, Iowa restructured its pipeline law, adding chapter 479B in yet another attempt to salvage state regulation of interstate pipelines.

In 1999, the Iowa Legislature – despite the federal courts' repeated rulings that Iowa law went too far in regulating interstate pipelines and was therefore preempted for invading federal regulatory jurisdiction – substantially amended all three of its pipeline regulation chapters to "*expand* the oversight of and standards for land restoration during and after pipeline construction." See "Instructions for County Inspectors," p. 3 **[Appendix A]** (emphasis added). The Iowa Utilities Board ("Board" or "IUB"), through its Board Members, then issued revised administrative rules to implement the 1999 legislation. The result was a new 199 Iowa Administrative Code ("IAC") chapter 9 issued on January 10, 2001. Given the history of Iowa's past efforts, it is not surprising that the revised Iowa Code chapter 479A and Iowa Administrative Code chapters 9 and 12 (which incorporates compliance with chapter 9) are invalid as they, too, are preempted by federal interstate pipeline regulation and conflict with the United States Constitution.

## FACTUAL BACKGROUND

### The Parties

Northern Natural is an interstate natural gas pipeline company, based in Omaha, Nebraska, that operates a 17,000 mile pipeline transmission system to transport natural gas in interstate commerce, primarily in the midwestern United States, including Iowa. [Plaintiffs' Statement of Facts ("SOF") ¶ 1.] Northern Border also is an interstate natural gas pipeline company, based in Omaha, which operates a 1,214 mile pipeline system to transport natural gas in interstate commerce from the Montana-Canada border to the Midwestern states, including Iowa. [SOF ¶ 2.] Pursuant to the Natural Gas Act ("NGA"), Natural Gas Pipeline Safety Act ("NGPSA"), National Environmental Policy Act

("NEPA"), Natural Gas Policy Act ("NGPA") and Energy Policy Act ("EPA"), all of Plaintiffs' pipeline construction is subject to federal law and a certification process or other regulations of or agreements with the Federal Energy Regulatory Commission ("FERC"). [SOF ¶ 15.] Additionally, in order to construct a pipeline, Plaintiffs must obtain easements from landowners whose land the lines will cross. [SOF ¶¶ 11-14.] Plaintiffs have hundreds of such easement contracts in Iowa, but they all generally follow a few "model" easements which have evolved over time. [SOF ¶¶ 11-14.] Some of these contracts date back to 1931; nearly all were executed prior to March 14, 2001. [SOF ¶¶ 11-14.] Some of these contracts grant perpetual easements to Northern Natural or Northern Border. [SOF ¶¶ 11-14.]

Defendants are Members of the IUB, the state agency charged by statute with regulating utilities, including interstate pipelines regulated under Iowa Code chapter 479A. [SOF ¶¶ 3-6.] The Board Members and staff working at their direction drafted and approved the regulations in 199 IAC chapters 9 and 12 which implement Iowa Code chapter 479A. [SOF ¶¶ 9-10.] The Board Members also are and would be the decisionmakers in any waiver proceedings seeking relief from requirements of the state's pipeline regulations. See 199 IAC § 9.2. [SOF ¶ 20.]

**History of the Present Dispute**

In 1999, the Iowa Legislature significantly revised Iowa's laws regarding construction, operation and maintenance of pipelines. [SOF ¶ 8.] As a result, Iowa law (specifically the amended Iowa Code §§ 479A.14, 479A.24, 479A.27) purports to "establish standards" for interstate natural gas pipelines pertaining to, *inter alia*: topsoil separation and replacement; repairs to drain tile; removal of rocks and debris; soil compaction; erosion control; construction in wet conditions; the ability of county inspectors to halt construction; the filing in advance of a land restoration plan; damages and

remedies to private landowners; and reversion of an easement owned by the pipeline company upon nonuse. [SOF ¶ 16.]

The Board initiated a rulemaking in response to the new law on September 15, 1999, to receive public comment on the adoption of proposed land restoration rules. The Board received written comments and held a workshop to receive oral comments. Northern Natural and Northern Border participated in the rulemaking process. On May 19, 2000, the Board issued an order in Docket No. RMU-99-10, In re: Restoration of Agricultural Lands During and After Pipeline Construction, "Order Commencing Rule Making."[2] The rules, which became effective on March 14, 2001, vacated the preexisting 199 IAC chapter 9 and replaced it with the current Chapter 9. [See SOF ¶ 10.]

Implementing the broad areas of regulation set forth in Iowa Code chapter 479A, the administrative rules require a detailed "land restoration plan" to be filed by an interstate natural gas pipeline company. See 199 IAC § 9.2. Even if the pipeline company has filed an environmental impact statement with FERC, the company still may be required to file the state land restoration plan. (The Board's granting of a waiver is discretionary and the waiver application itself is subject to a regulatory process.) That plan must comply with the requirements of 199 IAC § 9.4. Section 9.4 requires, for example, that: topsoil over the proposed pipeline trench be removed, segregated, and replaced at a depth of up to 36 inches; landowners can force pipeline companies to measure topsoil depth at multiple locations; topsoil must be segregated in a very specific manner; downstream tile lines must be capped or filtered; and rocks larger than three (3) inches in diameter must be removed from the top 24 inches of backfill. For a number of steps in pipeline construction, the state requires

[2] The Order is available on the Board's web site at: http://www.state.ia.us/government/com/util/_private/Orders/2000/0519_rmu9910.pdf

the scheduling of inspections by county inspectors. Moreover, the rules make clear that they establish "minimum standards," and purport to give the Board authority to "impose additional or more stringent standards as necessary to address issues specific to the nature and location of the particular pipeline project." 199 IAC § 9.1(2).

Through the NGA, NGPSA, NEPA, NGPA and EPA, the rules thereunder, FERC Orders, and agreements such as FERC's "Upland Erosion Control, Revegetation and Maintenance Plan," ("FERC Plan") the federal government also comprehensively regulates these same subjects. [SOF ¶ 15.] Further, private, pre-existing contractual agreements for easements between Plaintiffs and landowners also address and control many of these same subjects. [SOF ¶ 14.]

While it was obvious that these various sources of regulation of interstate pipeline projects were overlapping, the Board, through its members, in its Order in RMU-99-10 stressed the potential for applicants to request a waiver. Shortly thereafter, Northern Natural had an obligation to its customers to upgrade certain of its facilities near DeWitt, Iowa, by October 31, 2001, and therefore sought a waiver of the new rules. [SOF ¶ 18.] To its waiver application, Northern Natural attached a copy of the FERC Plan, which governed the DeWitt project. The FERC Plan addresses such issues as drain tile, road crossings, topsoil segregation, erosion control, soil compaction, and revegetation. The Office of Consumer Advocate ("OCA") filed a resistance to the waiver. [SOF ¶ 19.] The Board members denied the request for the waiver, in part adopting the OCA's reasoning, and in part stating "Northern does not allege that the rights conferred by the FERC Plan are substantially equivalent to the rights conferred on affected persons by the Board's land restoration rules. . ." [SOF ¶ 20.] The language of the denial of the requested waiver succinctly captures the conflict between federal and

state authority that must lead to summary judgment in Plaintiff's favor and the invalidation of state regulation of interstate natural gas pipelines.

## ARGUMENT

### I. IOWA'S ATTEMPT TO REGULATE THE CONSTRUCTION, OPERATION AND MAINTENANCE OF INTERSTATE NATURAL GAS PIPELINES IS PREEMPTED BY COMPREHENSIVE FEDERAL REGULATION OF THE TRANSPORTATION OF GAS IN INTERSTATE COMMERCE AND REGULATION OF RELATED FACILITIES.

Under the Supremacy Clause, federal law can preempt state law either expressly, by the terms of the federal statute or regulation, or through implied preemption. See Botz v. Omni Air Int'l, 286 F.3d 488, 493 (8th Cir. 2002). Preemption can be implied when the state law or process conflicts with or interferes with the operation of federal law, or when the federal government has pervasively regulated in a particular area so as to "occupy the field," and thereby demonstrating an intent to preempt state regulation. See South Dakota Mining Ass'n v. Lawrence County, 155 F.3d 1005, 1009-10 (8th Cir. 1998). In the present case, Iowa Code chapter 479A, and 199 IAC chapter 9 and 12 are expressly preempted in that the federal NGA grants exclusive authority to the federal government over interstate gas transportation and over interstate gas pipeline facilities. Even absent this express preemption, it is evident that the Iowa regulatory scheme is impliedly preempted as it interferes with and burdens the federal scheme, which is so extensively detailed as to occupy the entire field of interstate gas pipeline regulation. Accordingly, the Iowa regulatory scheme is invalid.

#### A. The Natural Gas Act Expressly Preempts State Regulation of Interstate Transportation of Gas and Interstate Gas Pipeline Facilities.

The touchstone of preemption analysis is the intent of Congress. See Schneidewind v. ANR Pipeline Company, 485 U.S. 293, 299-300 (1988). Where Congress has expressly "considered the

issue of pre-emption and included in the enacting legislation" a statement regarding the division of authority between the federal government and the states, the preemption analysis should focus on that express language. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992).

The Eighth Circuit Court of Appeals already has held that Congress "expressly preempted [Iowa's] regulation of safety in connection with interstate gas pipelines." ANR, 828 F.2d at 468 (citing the NGPSA, 49 U.S.C. § 1672(a)(1)); see also Kinley, 999 F.2d at 358 ("We held that the NGPSA expressly preempted virtually all of the provisions of Chapter 479 which dealt with safety regulation of interstate natural gas pipeline.") In both the Kinley and the ANR cases, the question of express preemption was limited to safety regulation; and in both cases additional regulations which Iowa argued were non-safety regulations also were preempted on non-severability grounds.

The present case directly presents the question "Is the scope of federal preemption over interstate natural gas pipelines broader than just safety regulation?" The answer, which has been made clear in cases since ANR, is a resounding "Yes." Federal preemption extends to all aspects of construction, operation, and maintenance of an interstate natural gas pipeline.

One year after ANR, the Supreme Court decided Schneidewind, where the Court reiterated that "the NGA confers upon FERC exclusive jurisdiction over the *transportation* and sale of natural gas in interstate commerce for resale." Schneidewind, 485 U.S. at 300-301 (citing Northern Nat. Gas Co. v. State Corp. Comm'n of Kansas, 372 U.S. 84, 89 (1963)(emphasis added)). The Court restated this statutory grant from 15 U.S.C. § 717(b) as follows: "FERC exercises authority over the rates *and facilities* of natural gas companies used in this transportation. . . ." Schneidewind, 485 U.S. at 301

(emphasis added). The next year, the Supreme Court provided an even more detailed analysis of the proper federal/state regulation of the natural gas industry:

> When it enacted the NGA, Congress carefully divided up regulatory power over the natural gas industry... Indeed, Congress went so far in § 1(b) of the NGA, 15 U.S.C. § 717(b), as to prescribe not only the "intended reach of the [federal] power, but also [to] specif[y] the areas into which this power was not to extend." 337 U.S. at 503, 69 S. Ct. at 1255. Section 1(b) conferred on federal authorities *exclusive jurisdiction* "over the sale *and transportation* of natural gas in interstate commerce for resale," Northern Natural, 372 U.S. at 89, 83 S. Ct., at 649, at the same time reserving to the States the power to regulate, among other things, "the production or gathering of natural gas."

N.W. Central Pipeline v. State Corp. Comm'n of Kansas, 489 U.S. 493, 510 (1989)(emphasis added); see also Public Utils. Comm'n of California v. FERC, 900 F.2d 269, 274 (D.C. Cir. 1990)("Cases are legion affirming the exclusive character of FERC jurisdiction where it applies").

Under these Supreme Court precedents, the scope of express federal preemption of interstate pipeline construction, operation and maintenance extends well beyond the safety regulations correctly preempted in ANR and Kinley. Express federal preemption extends to all aspects of "transportation" of gas in interstate commerce, and to all "facilities" used in or for such transportation. See Schneidewind, 485 U.S. at 301; N.W. Central, 489 U.S. at 510. The burdens, costs, delays and specifications involved in building an interstate pipeline are burdens on facilities and transportation (and the Plaintiffs' ability to obtain facilities and engage in transportation.) This is true even if such burdens are applied to the land required for the pipeline rather than the pipeline itself. See Guardian Pipeline L.L.C. v. 529.42 Acres of Land, 210 F. Supp.2d 971, 974-75 (N.D. Ill. 2002)(rejecting objections to condemnation based on soil depth, topsoil segregation and similar concerns, holding

such concerns should have been raised with FERC in certificate proceeding). The state regulations at issue here add such burdens including a duplicative regulatory process and additional substantive requirements as to construction standards for land restoration. Such regulations are not within the specifically listed areas Congress left to the states (i.e., production and gathering of natural resources within state boundaries). Accordingly, such state regulations are expressly preempted, and under Cipollone, there is no need to look any further. Iowa's regulations on interstate pipelines must be invalidated.

**B. The National Gas Act and Other Federal Laws and Regulations Implementing Those Laws Supersede State Regulation of Interstate Natural Gas Pipeline Construction, Operation and Maintenance by Implied Preemption.**

Plaintiffs assert that the express language of 15 U.S.C. § 717(b) unambiguously establishes the intent of Congress to provide exclusive federal jurisdiction over the transportation and facilities for natural gas in interstate commerce – i.e. the pipelines. Even absent such an explicit Congressional statement, however, the Iowa regulations would still be preempted. Implied preemption can be found where the federal regulations "occupy the field" or where the state standards interfere with the standards or objectives of the federal government. See, e.g., South Dakota Mining, 155 F.3d at 1009-10. In the present case, the Iowa regulations fail under either of these implied preemption approaches.

1. The Extensive Complex of Federal Statutes, Regulations, and FERC Agreements Completely Occupies the Field of Interstate Pipeline Construction, Operation and Maintenance.

For Plaintiffs to build, operate and maintain an interstate gas transmission line, they must adhere to comprehensive regulations found in or promulgated under the NGA, the NGPSA, and the NEPA, among others. This comprehensive regulation is conducted under the jurisdiction of FERC

and the Department of Transportation ("DOT"). The applicable statutes and regulations literally take up volumes. [See, e.g., SOF ¶ 15.] Most relevant to this case, however, the federal rules already require environmental and land use review by FERC for nearly every pipeline project. See, e.g, 18 C.F.R. § 380.6(a)(3)(major pipeline construction projects using new rights-of-way require environmental impact statements); 18 C.F.R. § 380.12; 18 C.F.R. § 157.206(b)(requiring environmental compliance as a "standard condition" of a blanket certificate); see also No Tanks, Inc. v. Public Utils. Comm'n of Maine, 697 A.2d 1313, 1315-16 (Me. 1997). The rules also require notification of nearby landowners, as well as local and state governments, 18 C.F.R. § 157.6(d), and consideration of landowner concerns, 18 C.F.R. § 380.15(b).

The environmental review required by FERC is extensive. See, e.g., 18 C.F.R. § 380.12 and App. A; 18 C.F.R. § 157.206(b); see also **Appendix G**. Among other requirements, the interaction of subsection 157.206(b) and 18 C.F.R. § 380 App. A, Resource Report 7 requires that an applicant for a FERC certificate either must adopt the FERC Plan or "compare" their proposed plan with the FERC Plan in their federal filing so the regulator can consider the differences when making regulatory decisions. The FERC Plan **[Appendix E]** requires (among many other things) environmental inspectors (see Plan Section III), specifies the depth and process for topsoil segregation (Section V-B), provides requirements for the repair of drain tile (Section V-C), specifies the size and depth for removal of rock from backfill (Section VI-A(4)), addresses soil compaction remediation (Section VI-C), and requires revegetation (Section VI-D). All of this is in addition to the numerous other FERC certification requirements and DOT safety requirements all of which impact and control the

placement, materials, construction, operation, maintenance, and abandonment of interstate natural gas pipeline.

In light of these exhaustive regulations, there can be no doubt that the federal government has occupied the field of interstate natural gas pipeline regulation. Tennessee Gas Pipeline v. Massachusetts Bay Trans., 2 F. Supp.2d 106, 111 (D. Mass 1998)(citing Schneidewind, and collecting cases); see also **Appendix I** at 2, 4 ("The effects on. . . crops, water supplies, soil, vegetation. . . landowner interests, and more, are taken into consideration [by FERC].")

> This regulatory scheme governs virtually every aspect of the transportation and sale of natural gas. It includes provisions for determining the price at which natural gas may be sold, whether natural gas facilities may be built or modified, where they may be located, the methods by which they are constructed, and the safety standards that must be observed.

Algonquin LNG v. Loqa, 79 F. Supp.2d 49, 51 (D. R.I. 2000)(finding NGA and NGPSA and regulations thereunder "establish a comprehensive scheme of federal regulation" and preempting local zoning authority); see also National Fuel Gas Supply v. Public Serv. Comm'n of New York, 894 F.2d 571, 577 (2d Cir. 1990)(finding federal regulation occupies the field and noting FERC's review of environmental and other site-specific factors such as the use of surrounding land). In National Fuel, the Court repeatedly noted the overlap between the New York "environmental compatibility" requirements and the federal regulations in finding there was no regulatory space left in which the state rules could exist. See National Fuel, 894 F.2d at 576, 577, 579. Even a cursory comparison of the FERC Plan and 199 IAC chapter 9 demonstrates the magnitude of the overlap between the state and federal regulation in the present case. Such an overlap is not permitted under the NGA; Iowa's statute and rules attempting to regulate in the same area as the federal pipeline regulations are invalid.

2. Iowa Code chapter 479A and the Rules Implementing the Chapter Are Preempted as they Conflict With the Federal Regulations and Objectives.

"Even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." Crosby v. National Foreign Trade Council, 530 U.S. 363, 372 (2000)(citing Hines v. Davidowitz, 312 U.S. 52, 66-67 (1941)). If, "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," that also demonstrates an impermissible conflict. See Crosby, 530 U.S. at 373 (citing Hines, 312 U.S. at 67). In the present case, Iowa's regulations both prevent the "accomplishment . . . of the full purposes" of Congress and they directly conflict in a number of particulars with the decisions made by Congress and the federal agencies.

One of the "purposes and objectives" of Congress that has been identified by other courts is uniformity of regulation of an interstate network of pipelines and facilities. See Transcontinental Pipeline Corp. v. State Oil and Gas Bd. of Mississippi, 474 U.S. 409, 419, 423 (1986)(citing Northern Natural, 372 U.S. at 91-92); Loqa, 79 F. Supp. 2d at 52 ("strong federal interest in establishing a *uniform* system of regulation" (emphasis added)). Given the extraordinary level of detail that both the federal regulations and the Iowa regulations contain, it is easy to see the problems that would be created if every state enacted different but equally detailed regulations on interstate pipelines. Different equipment, different training, different processes, and different contracts all would be needed for different parts of a pipeline as it ran from state to state. The resource burden just to keep compliance issues straight would be significant. This is why federal uniformity is important; Iowa's

state-specific requirements are contrary to this purpose and are therefore in conflict with the federal approach and must be preempted.

In addition, the requirement that interstate pipelines go through an entire state review process (the filing and approval of the land restoration plan) after going through a similar federal process is itself generally considered a conflict with federal law. See NE Hub Partners L.P v. CNG Transmission Corp., 239 F.3d 333, 344 (3d Cir. 2001)("the state regulatory process itself can be the preempted burden"); National Fuel, 894 at 578 ("the practical effect [of a state process] would be to undermine the FERC approval by imposing the costs and delays"); Kern River Gas Transmission v. Clark County, Nevada, 757 F. Supp. 1110, 1115 (D. Nev. 1990)("The Court accordingly holds that it is unnecessary for Plaintiff to apply for . . . permits which . . . unduly delay or encumber this federally approved interstate gas facility."); cf. Guardian Pipeline, 210 F. Supp.2d at 974 ("The validity and conditions of the FERC Certificate cannot be collaterally attacked in district court."). Where FERC has already reviewed the required information and approves a particular interstate gas transportation facility, additional state process or requirements amount to a state second-guessing the judgment of FERC. See **Appendix F** at 66-70 (FERC considering agricultural impacts in certificate proceeding). Such a collateral attack on a FERC order is an affront to the Supremacy Clause.

Such conflict concerns are not merely hypothetical. There are numerous provisions of the state regulatory scheme that directly conflict with the decisions made in the federal regulations. A non-exhaustive list includes:

- ***Topsoil Removal*** - the FERC Plan requires removal of topsoil to at least 12 inches in depth; 199 IAC § 9.4(1)(a) requires removal of topsoil to a depth up to 36 inches over the pipeline;

- ***Drain Tile Damage*** - 199 IAC § 9.4(2)(b) requires that, if temporary repairs are not made, the upstream tile line must be screened; the FERC plan does not allow the use of screened tile unless the local soil conservation authority and the landowner agree to such use;

- ***Rock Removal*** - the FERC Plan requires removal of rocks of more than four (4) inches in diameter from the top 12 inches of backfill soil; 199 IAC § 9.4(3) requires that all rocks over three (3) inches in diameter be removed from the top 24 inches of backfill.

*The Board Members concede that such conflicts exist.* Defendants' Response to Plaintiffs' Interrogatory No. 1 **[Appendix J]**. The board members agree that the sample easement contracts provided are in conformity with applicable federal pipeline regulations. When evaluating the same contracts under Iowa Code chapter 479A and the administrative rules, the Defendants note various "compliance issues" and "inconsistencies." See Defendants' Response to Plaintiffs' Interrogatories No. 2-4. **[Appendix J]**. If a federally certificated interstate transportation facility project raises "compliance issues" and "inconsistencies" under state law, conflict preemption requires the invalidation of the offending state law. Whether under express or implied preemption principles, whether by occupation of the field or conflict, the regulations imposed by Iowa Code chapter 479A and the implementing administrative rules are preempted by supreme federal law, and summary judgment should be granted to the Plaintiffs.

## II. BY IMPLEMENTING AND ENFORCING IOWA CODE CHAPTER 479A AND BY AMENDING AND ENFORCING 199 IAC CHAPTER 9 TO PROVIDE MORE BURDENSOME REGULATION OF INTERSTATE NATURAL GAS PIPELINES, DEFENDANTS HAVE IMPAIRED PLAINTIFFS' PRE-EXISTING EASEMENT CONTRACTS IN VIOLATION OF THE CONTRACTS CLAUSE.

The Contracts Clause of the Constitution, Article I § 10, provides that no state shall pass any law impairing the obligations of contracts. As the Eighth Circuit has recently reiterated, the test for a violation of the Contracts Clause has three parts: (1) does the state law substantially impair pre-

existing contracts; (2) if so, does the state have a "significant and legitimate public purpose" behind the regulation; and (3) if so, is the "adjustment of the rights and responsibilities of the contracting parties" based on reasonable conditions and of an appropriate character. See Equipment Mfrs. Inst. v. Janklow, 300 F.3d 842, 850 (8th Cir. 2002).

It is beyond dispute that the 1999 and 2001 changes in the Iowa Code and Administrative Code impaired preexisting contracts. Plaintiffs long have had easement agreements in place for which they gave consideration to Iowa landowners in arms length transactions. The only possible argument is whether the impairment is "substantial." Plaintiffs assert that all of the changes are substantial impairments: the new regulations change the type and amount of damages that Plaintiffs may owe landowners, and they increase the burden on the Plaintiffs through more onerous construction and post-construction remediation requirements. Even if one could argue, however, that these impairments are not "substantial," there is one change in the law that undoubtedly meets the test. The addition of Iowa Code § 479A.27 is the ultimate impairment. This section allows reversion of the easement after five years of non-use even if the contract has granted (and Plaintiffs have paid for) a perpetual easement. Worse yet, even if the easement reverts to the landowner, if the pipeline is in the ground, the pipeline company would remain responsible for it, despite loss of the right-of-way. Considerably smaller impairments have been found by the Eighth Circuit to violate the Contracts Clause. See, e.g., Janklow, 300 F.3d at 854-55 (shifting the burden from the dealer to the manufacturer for evaluating potential buyers of dealerships); Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383, 385 (8th Cir. 1994)(affirming McDonalds Corp. v. Nelson, 822 F. Supp. 597, 600 (S.D. Iowa 1993) on similar burden shifting between franchisees and franchisors).

The Iowa pipeline regulations also fail the "substantial and legitimate public purpose" test. The Eighth Circuit repeatedly has told Iowa that interstate pipelines are a matter of *federal*, rather than state, concern. See Kinley, *supra*; ANR, *supra*. "The very fact that Congress saw fit to provide a statutory scheme for authorizing 'Certificates of Public Convenience and Necessity' through the FERC pursuant to the Natural Gas Act indicates that there are substantial *national* interests at stake." Kern River, 757 F. Supp. at 1119 (emphasis added).

The Eighth Circuit has framed this test as requiring the state to show "that the regulation protects a 'broad societal interest rather than a narrow class.'" Janklow, 300 F.3d at 859 (citation omitted). The burden of this showing increases with the level of impairment. Id. at 860. Here, the only class protected is the narrow class of landowners providing easements to the interstate pipeline company. This is not a "broad societal interest," but rather is a direct "adjust[ment] of the rights and responsibilities of the contracting parties" by giving landowners more by fiat than they bargained for with Plaintiffs. See Janklow, 300 F.3d at 861 (citing McDonalds, 822 F. Supp. at 608). The Eighth Circuit has expressly held that such an interest is insufficient under the Contracts Clause.

Finally, it cannot be a "legitimate" purpose if it violates the Constitution. With respect to Iowa Code § 479A.27 (and perhaps other burdens as well, but this is the most obvious), the Iowa regulations constitute an unlawful taking without just compensation. See U.S. Const. Amend. 5. Under § 479A.27, the state establishes a process where the property ownership expectations of a pipeline company can be overturned by state process, and the state can "occupy" that property and give it back to the original landowner without compensating the pipeline company. This is a classic taking. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35 (1982). Violating the

Constitution cannot be a legitimate interest; this is yet another reason why the Iowa regulations violate the Contract Clause.

**III. RELIEF AND REMEDIES UNDER 42 U.S.C. § 1983 ARE APPROPRIATE IN THE PRESENT CASE.**

In its December 5, 2001 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, the Court raised *sua sponte* the viability of Plaintiffs' claim under 42 U.S.C. § 1983. Plaintiffs assert that a claim under § 1983 is appropriate in the present case. The burden is squarely on the Board Members to establish the absence of a § 1983 remedy, as there is a presumption that § 1983 is available in all but exceptional circumstances. See Livadas v. Bradshaw, 512 U.S.107, 133 (1994) ("[A]part from these exceptional circumstances, § 1983 remains a generally and presumptively available remedy for claimed violations of federal law.") The Board Members have presented no "exceptional circumstances" that would suggest that § 1983 is not available to Plaintiffs protecting their rights under the NGA, NGPSA, NGPA and NEPA to be free from state regulation of their interstate pipeline construction, operations and maintenance.

The Court raised a concern that the Supremacy Clause does not give rise to a claim under § 1983, citing Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107-08 (1989) and Soo Line R.R. Co. v. City of Minneapolis, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998). These cases do not preclude relief under § 1983 in the present case. Indeed, Golden State was a preemption case where the Supreme Court, after noting that invocation of the Supremacy Clause does not automatically, of itself, permit a § 1983 action, ***permitted the plaintiff's § 1983 to proceed***. As one court has explained in rejecting Soo Line's interpretation of Golden State in a preemption case:

> In [Soo Line], the court held that the defendant city's actions were preempted by § 10501(b) of the ICCTA but held that "a federal preemption claim premised upon a violation of the Supremacy Clause is not cognizable under 42 U.S.C. § 1983." But that court did not inquire as to whether the underlying statute, the ICCTA, created a right in the plaintiff. Because Golden State makes it clear that ***a court can look to the underlying statute***, Defendants' reliance on Soo Line is misplaced.

Boston & Maine Corp. v. Town of Ayer, 206 F. Supp. 2d 128, 132 (D. Mass. 2002)(emphasis added).

The Supreme Court in Golden State did not preclude § 1983 claims in preemption cases, but rather addressed the circumstances in which claims of federal preemption of state law under the Supremacy Clause *can* provide a basis for § 1983 relief. The Court held in Golden State that a claim that the National Labor Relations Act (NLRA) preempted actions taken by the City of Los Angeles provided a proper basis for relief under § 1983. The Court acknowledged that "the Supremacy Clause, of its own force, does not create rights enforceable under § 1983," but held that the Supremacy Clause "secure[s] federal rights by according them priority whenever they come in conflict with state law." Id. at 107 (internal quotation omitted). It then set forth a three-part test governing whether preemption claims present a proper basis for § 1983 relief:

> the availability of the § 1983 remedy turns on whether the statute [that is alleged to have preemptive force], by its terms or as interpreted, creates obligations sufficiently specific and definite to be within the competence of the judiciary to enforce, is intended to benefit the putative plaintiff, and is not foreclosed by express provision or other specific evidence from the statute itself.

Id. at 108 (internal citations omitted). See Little Rock Family Planning Svcs, P.A. v. Dalton, 60 F.3d 497, 501-02 (8th Cir. 1995) (applying Golden State test to hold enforceable under § 1983 plaintiffs'

Supremacy Clause claim that provisions of states' laws were inconsistent with Hyde Amendment to Medicaid statute), rev'd in part on other grounds, 516 U.S. 474 (1996).

The Golden State test is satisfied with respect to the NGA and other federal provisions that are the basis for the preemption claim. The first prong of the Golden State test asks whether the federal statute claimed to have preemptive force "creates obligations sufficiently specific and definite to be within the competence of the judiciary to enforce." Id. at 108. The Supreme Court has stated that this inquiry focuses on "whether the provision in question creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment,'" Golden State, 493 U.S. at 106 (internal citation omitted), and on whether the alleged federal right is "too vague and amorphous" so as to be "beyond the competence of the judiciary to enforce," Golden State, 493 U.S. at 106 (internal citation omitted).

Here, courts – including the Supreme Court – have repeatedly determined what the section of the NGA allocating federal and state responsibilities means, and have found this division of responsibility "binding" on states. See, e.g., Schneidewind, *supra*; Boston & Maine, 206 F. Supp.2d at 131 (finding prong of § 1983 test satisfied by a "right not to be regulated") and at 132 (citing Petrey v. City of Toledo, 246 F.3d 548, 565 (6th Cir. 2001) as example of the same proposition).

The second prong of the Golden State test asks whether the statutory provision "is intended to benefit the putative plaintiff." Golden State, 493 U.S. at 108. One of the policy goals of the NGA is uniformity of regulation. See, e.g., Loqa, 79 F. Supp. 2d at 52. The interstate natural gas pipeline companies, as the regulated entity, are the parties who directly benefit from uniformity. Again, this prong of Golden State is met in the present case.

The final inquiry under Golden State is whether a § 1983 remedy is "foreclosed by express provision or other specific evidence from the statute itself." Golden State, 493 U.S. at 108. The Supreme Court has made clear that "the burden to demonstrate that Congress has expressly withdrawn the [§ 1983] remedy is on the defendant." That burden is a heavy one: "'We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy' for the deprivation of federally secured rights." Golden State, 493 U.S. at 107 (quoting Wright, 479 U.S. at 423-24). Here, that burden cannot be satisfied. The NGA contains no "express provision" or "specific evidence" foreclosing § 1983 relief. The Plaintiffs in the present case meet all three prongs of the Golden State test. Thus, the Plaintiffs' request for relief under § 1983 should be granted.

## CONCLUSION

Iowa's latest attempts, through the Defendant Board members, to place state law burdens on interstate natural gas pipeline construction must meet the same fate as Iowa's regulations did in ANR and as its interstate hazardous liquids pipeline regulations did in Kinley. The federal government expressly has secured exclusive jurisdiction over interstate natural gas pipeline transportation and facilities, including the construction of the pipeline itself. Moreover, the federal government occupies the entire field of construction, operation and maintenance of such pipelines. Finally, the state's unlawful regulations have the additional flaw of impairing existing contracts between Northern Natural or Northern Border and local landowners. Accordingly, the Court should grant summary judgment, declaring Iowa Code chapter 479A, as well as 199 IAC chapters 9 and 12 invalid, and further grant summary judgment in favor of Plaintiffs under 42 U.S.C. § 1983, finding that Defendants have unlawfully interfered with Plaintiffs' federally protected rights.

PHILIP E. STOFFREGEN
HELEN C. ADAMS
BRET A. DUBLINSKE
OF
DICKINSON, MACKAMAN, TYLER & HAGEN, P.C.
1600 Hub Tower, 699 Walnut Street
Des Moines, Iowa 50309-3986
Telephone: (515) 244-2600
FAX: (515) 246-4550
pstoffre@dickinsonlaw.com
hadams@dickinsonlaw.com
bdublins@dickinsonlaw.com

ATTORNEYS FOR
NORTHERN NATURAL GAS COMPANY
AND NORTHERN BORDER PIPELINE COMPANY

OF COUNSEL:

JAMES R. TALCOTT
Northern Natural Gas Company
1111 South 103rd Street
Omaha, Nebraska 68124-1000
(402) 398-7003
(402) 398-7426 FAX
Jim.talcott@dynegy.com

THOMAS LEHAN
Northern Border Pipeline Company
13710 FNB Parkway
Omaha, Nebraska 68154
(402) 398-7701
(402) 398-7780 FAX
Tom.lehan@nborder.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the document attached to this Certificate was hand-delivered to the persons listed below at the addresses indicated on the 12 day of November, 2002.

Alan Kniep
David Lynch
Iowa Utilities Board
350 Maple Street
Des Moines, Iowa 50319

[signature]

F:\BDUBLINS\WP\nng-iub-msj-brf-1110.wpd